# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | |
|---|---|
| ALEXIS SANCHEZ, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>v.<br><br>CAVENDER STORES, LTD.,<br><br>                Defendant. | Case No. 4:22-cv-01016-ALM<br><br>Judge Amos L. Mazzant, III<br><br>**PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

      Plaintiff Alexis Sanchez moves the Court to approve his class action settlement with Cavender Stores, Ltd, as "fair, adequate, and reasonable." With this settlement, Mr. Sanchez achieved what he set out to accomplish with this case. Following Cavender's data breach in April 2022, Mr. Sanchez demanded that Cavender's compensate class members for the losses they suffered, protect them from the losses they may suffer, and improve its data security practices. If approved, the settlement will deliver just that, securing four benefits for the class.

      First, it guarantees Cavender's will pay all claims for lost money and time, up to $500 for "ordinary" losses, $75 for lost time, and $2,500 for "extraordinary" losses stemming from the breach. And the settlement secured this relief without capping what Cavender's must pay, meaning it will pay every approved claim in full. Second, Cavender's offered class members credit and identity monitoring to mitigate their chances for suffering identity theft and fraud. Third, Cavender's agreed to improve its cybersecurity, addressing the problems that led to its breach and improving its systems to prevent breaches. And fourth, Cavender's paid to administer the Agreement, Mr. Sanchez's fee request, and his service award—all without diminishing the benefits to the class.

1

Through the parties' notice program, they directly notified 96% of class members about the settlement via U.S. Mail, providing them a chance to claim benefits either online or by mail. In response, **no** class members opted out or objected to the settlement.

As a result, the settlement is "fair, adequate, and reasonable," and the Court should approve it. Indeed, the Court should presume the settlement satisfies Rule 23(e) and the Fifth Circuit's standards for approval because the parties negotiated and administered the settlement at "arm's length." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010) (There is a "strong presumption that an arms-length class action settlement is fair—especially when doing so will result in significant economies of judicial resources"). This is not to mention that the risks in litigating this matter through discovery and trial merit settlement at this stage, as Mr. Sanchez had the facts needed to evaluate his case's strengths and weaknesses and the relief that would best benefit the class. In other words, the results achieved under the circumstances here exceed what Rule 23(e) and the Fifth Circuit expect from Mr. Sanchez and his counsel in approving this settlement.

## BACKGROUND

### A. The Litigation

Cavender's is a "Western clothing store" with 94 stores concentrated in the South and Southwest, including Las Vegas, Nevada, and Orlando. Doc. 1 ("Compl.") ¶2. To run its business, Cavender's must collect "personally identifiable information" ("PII") and "protected health information" ("PHI") from its employees, including information like their "Social Security numbers, financial account numbers, credit card numbers, debit card numbers, medical information, health insurance information, and the names of employees' children[.]" *Id*. ¶19. In collecting this data, Mr. Sanchez alleged Cavender's accepted a duty to protect it under Texas law

and store policy. *Id*. ¶15. But despite acknowledging its duty, Mr. Sanchez alleged Cavender's breached it by failing to implement the security safeguards needed to fulfill it. *Id*. ¶17.

In April 2022, criminals bypassed Cavender's systems and accessed the PII and PHI belonging to its "current and former" employees and their children. *Id*. ¶22. Media outlets reported that a "particularly notorious ransomware group," Black Basta, carried out the hack and leaked "100% of the stolen files" online. *Id*. ¶25 (quotations omitted). That breach and leak exposed Mr. Sanchez and the class to harm, including identity theft and fraud. In fact, following the breach, the I.R.S. and U.S.P.S. notified Mr. Sanchez that someone had started a business in his name and changed his mailing address. *Id*. ¶37.

For those reasons, Mr. Sanchez sued Cavender's claiming that it failed to protect his PII and PHI using "reasonable security measures." *Id*. ¶28. His claims alleged that Cavender's violated its duties to protect his data under tort, contract, and statutory principles, entitling him to his losses and an order requiring Cavender's to improve its data security. *See generally id.* Mr. Sanchez alleged those claims under a nationwide class, seeking to represent all victims impacted by the breach. *Id*. ¶72.

### B. Mediation and Settlement

Given the risks that litigating this matter posed to both sides, the parties agreed to mediate Mr. Sanchez's claims. Doc. 13-3 ¶ 8. In March 2023, the parties engaged Bruce Friedman from JAMS to mediate their case, exchanging terms through Mr. Friedman at "arm's length." *Id*. ¶ 7. Under his guidance, the parties brokered a framework for settling the case, agreeing to a term sheet that the parties developed into the Agreement, as Mr. Sanchez details below. *Id*. ¶¶ 8-9. In May 2023, the parties finalized terms, including the Agreement's notices and the administrator that would notify the class and process claims. *See generally id.* And although the parties negotiated

Mr. Sanchez's service award and attorney fees during this process, they avoided doing so until after the parties had negotiated the terms benefitting the class. *Id.* ¶ 8.

### C. The Settlement

To restate, the Settlement afforded the class four benefits, without capping their relief under any "aggregate cap" sometimes used in data breach settlements. The first benefit category was monetary relief for losses. Doc. 13-1 ("Agreement"), § 2. That included documented "ordinary losses" up to $500, including money spent on credit reports, credit monitoring, unreimbursed bank fees, data charges, identity theft insurance, and other expenses incurred following the breach. *Id.* § 2.1.1. It also covered "extraordinary losses" up to $2,500, for documented and unreimbursed losses caused by identity theft or fraud. *Id.* § 2.1.2. And last, class members could claim their lost time at $75 per hour for three hours—subject to the $500 "ordinary" losses cap. To claim lost time, they need have attested to it and describe how they spent their time. *Id.*

Second, class members could claim two years' credit monitoring and identity theft insurance. *Id.* § 2.3. That benefit included class members who had enrolled in Cavender's one-year credit monitoring program started after the breach, allowing enrolled members to extend their monitoring by one year. *Id.* This Settlement relief saves class members from buying their own monitoring and insurance plans and its cost will not impact any other benefit under the agreement, as Cavender's agreed to pay it "separate and apart" from all other benefits. *Id.*

Third, Cavender's agreed to implement and maintain security measures meant to address the vulnerabilities that criminals exploited to steal the class's PII. *Id* § 2.4. This will protect the employee PII Cavender's still possesses and guard against attempts to breach Cavender's again.

And fourth, Cavender's paid to administer the settlement, mediation costs, and will pay any service awards and attorney fees the Court approves. *Id.* §§ 2.6, 3.2. That includes up to

$162,500 for attorney fees, $8,475 for costs, and up to $2,500 for a service award. *Id*. § 7. All amounts paid under those agreements are, again, "separate and apart" from the benefits afforded to the class, meaning they will not detract from what the class receives. *Id*. The parties agreed on these terms only after they agreed on the terms benefitting the class, ensuring they had secured the class's core benefits without considering what Mr. Sanchez and his attorneys would receive. *Id*. Under the agreement, Mr. Sanchez has petitioned the Court to approve his fee and service award requests, a decision the Court will render at its final approval hearing. Doc. 15.

Last, the Agreement outlined how the parties were to notify the class, specifying how to do so and how to accept claims, opt-outs, and objections. Class members could object within 60 days by notifying RG/2 and the parties' counsel in writing about the bases for their objection, including all the information needed to process it. *Id*. § 5. To opt-out, class members could notify RG/2 about their choice by "clearly manifesting" their intent to opt out in writing. *Id*. § 4. Otherwise, class members could submit claims on the claim form provided. *Id*. Ex. C.

In exchange for any benefits, class members released Cavender's from liability related to its data breach. *Id*. §§ 1.21, 6.1. But the parties tailored that release to *only* those claims arising from the breach, preserving any claims that class members may otherwise have against Cavender's. *Id*.

### D. Preliminary Approval and Notice

In May 2023, Mr. Sanchez moved the Court to "preliminarily" approve the Agreement and implement its terms. Doc. 13. After considering the merits underlying the proposal, the Court granted Mr. Sanchez's motion, ordering the parties to proceed with RG/2 Claims Administration, LLC, as the Claims Administrator and issue notice to the class. Doc. 14. Since then, the parties

have carried out the Agreement's terms, serving settlement notices on class members and collecting their claims.

The Claims Administrator, RG/2, was charged with notifying the class and processing class member claims. *See* Sutor Dec. RG/2 has been administering settlements since 2000, including for consumer class action lawsuits like this case, administering and distributing over $1.8 billion in settlement proceeds. *Id*. ¶ 2. As the Claims Administrator, RG/2 was required to file CAFA notices, update contacts for class members, create a settlement website, notify the class by First Class Mail, and process claims, opt-out requests, and objections. *Id*. ¶ 3. Since May 2023, RG/2 has accomplished each task.

In May 2023, it sent CAFA notices to 44 attorneys general, receiving no responses objecting to the settlement. *Id*. ¶ 4. Between June and July 2023, RG/2 compiled 27,237 contact records for class members and sorted them through the USPS's NCOA database to ensure accuracy. *Id*. ¶ 5. It also set up the settlement website, [www.cavenderemployeedatasettlement.com](www.cavenderemployeedatasettlement.com), that listed all settlement documents, claim forms, case details, and gave class members the chance to submit their claims online. *Id*. ¶ 6. RG/2 then notified the class by 27,237 mailers, requesting that they complete their claim forms and return them by mail to a designated address, providing members 60 days to opt out or object and 90 days to claim benefits. *Id*. Ex. C. To identify every class member, RG/2 assigned them a "unique Settlement Class Member Login and Password," allowing them to complete the claim through the website if they wished. *Id*. ¶ 8. As a result, class members had the time and means they needed to claim benefits.

RG/2 received 3,909 notices returned as "undeliverable by USPS." *Id*. ¶ 9. This meant that RG/2's program reached around 85% of the class with the first mailer—speaking to the reliability

of RG/2's system and the contact information provided by Cavender's. *Id*. RG/2 then skip traced addresses for members whose notice was returned, identifying 2,803 updated addresses. *Id*. Through these efforts, RG/2 directly notified 26,249 class members, or around 96% of the class. *Id*. ¶ 10.

## LEGAL STANDARD

Courts approve settlements under Rule 23(e). Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."). At root, the analysis centers on whether the settlement is "fair, reasonable, and adequate" *Id*. And that concept considers four factors under Rule 23(e): (i) "adequacy of representation;" (ii) whether there were "arm's length" negotiations; (iii) "adequacy of relief;" and (iv) equity between class members. *Id*. Within the third factor, "adequacy of relief," the Court considers the case's risks, how the parties propose distributing relief, attorney's fees terms, and any other agreements impacting settlement. *Id*.

These factors overlap with Fifth Circuit precedent governing the approval process. *See Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (identifying six factors for approval). The factors consider: (i) whether there was fraud or collusion when negotiating the agreement; (ii) the case's complexity; (iii) the litigation stage and discovery taken; (iv) the risk in litigating the case; (v) the "range of possible recovery;" and (vi) whether the class, class counsel, and plaintiff recommend the settlement.

Because these factors overlap with one another, "courts in this circuit often combine them in analyzing class settlements." *ODonnell v. Harris Cnty., Texas*, No. CV H-16-1414, 22019 U.S. Dist. LEXIS 151159, at *26 (S.D. Tex. Sept. 5, 2019). In so doing, a district court must "keep in

mind the strong presumption in favor of finding a settlement fair." *Purdie v. Ace Cash Express, Inc.*, No. 301CV1754L, 2003 U.S. Dist. LEXIS 22547, at *16 (N.D. Tex. Dec. 11, 2003). That analysis does not mandate that plaintiff maximize their recovery: "[a] proposed settlement need not obtain the largest conceivable recovery for the class to be worthy of approval; it must simply be fair and adequate considering all the relevant circumstances." *Klein*, 705 F. Supp. 2d at 649. Indeed, requiring a plaintiff to maximize their recovery would defeat the point in settling, as "compromise is the essence of a settlement…the settlement need not accord the plaintiff class every benefit that might have been gained after full trial." *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978).

In other words, barring any fraud or collusion, a district court should hesitate to "substitute [their] own judgment for that of counsel." *Klein*, 705 F. Supp. 2d at 649. The settlement here satisfies that analysis.

**ARGUMENT**

**A. The Settlement is fair, reasonable, and adequate**

The settlement is fair, reasonable, and adequate under Rule 23(e) and the *Reed* factors because it delivers relief to over 27,000 current and former employees impacted by Cavender's breach *now*, rather than risk their relief in litigation. Indeed, the settlement secures all the benefits Mr. Sanchez demanded when he sued Cavender's: to pay for the class's losses, mitigate future losses, and eliminate the vulnerabilities leading to the breach. Depriving the class that benefit and all others on the speculative chance they may do better years from now would not serve the class's interests. For these reasons, the settlement satisfies all factors for approval.[1]

    i.    <u>The Court should presume the settlement is "fair, adequate, and reasonable"</u>

---

[1] Because the *Reed* factors overlap with the factors under Rule 23, Mr. Sanchez consolidates his analysis below.

8

As Mr. Sanchez explains above, there is a "strong presumption that an arms-length class action settlement is fair—especially when doing so will result in significant economies of judicial resources." *Klein*, 705 F. Supp. 2d 632, 650. Using a mediator to facilitate negotiations enhances this presumption: "use of a mediator further weigh[s] in favor of a finding that the Settlement was fairly negotiated[.]" *C.C. v. Scott*, No. 4:18-CV-828-SDJ, 2022 U.S. Dist. LEXIS 174005, at *8 (E.D. Tex. Sep. 26, 2022) (internal citations and quotations omitted); *see also Quintanilla v. A & R Demolition Inc.*, 2007 WL 5166849, at *4 (S.D. Tex. May 7, 2007) (holding that a class action settlement to be free of fraud or collusion when "[t]he settlement was reached through arms-length negotiations after a long, hard-fought mediation with a neutral"). And in "absence of any evidence to the contrary," the Court may also presume that "no fraud or collusion occurred between opposing counsel[.]" *Welsh v. Navy Fed. Credit Union*, No. 16-CV-1062, 2018 U.S. Dist. LEXIS 227456, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018).

Mr. Sanchez and his counsel qualify for this enhanced, "strong presumption." They retained a mediator experienced in settling data breach class actions, Bruce Friedman from JAMS. Doc. 13-3 ¶ 8. They communicated their positions through him, positions that were "adversarial in nature" as the parties "forcefully advocat[ed] the position of their respective clients." *Id.* ¶ 7. Those positions were informed by pre-mediation discovery exchanged under FRE 408, allowing Mr. Sanchez's counsel to understand the landscape affecting settlement. *See In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1064 (approving settlement because "[t]he parties have shown that they possessed sufficient information to gauge the strengths and weaknesses of the claims and defenses"). And they avoided any collusion when they insisted that the parties agree on the class's benefits before negotiating Mr. Sanchez's attorney fees or service award. *Id.* ¶ 8.

As a result, the parties fulfilled what Rule 23(e) and caselaw expect under this factor, entitling them to start this analysis with the "presumption of fairness."

  ii.  <u>Mr. Sanchez and his attorneys represented the class "adequately"</u>

Mr. Sanchez and his attorneys satisfy Rule 23(e)(2)(A) because they litigated the class's claims without conflict with the class and have established that they put the class's interests before their own. *See generally* Doc. 15-1 (Borrelli Fee Dec.); *In re Heartland Payment Sys.*, 851 F. Supp. 2d at 1055 (adequacy satisfied when class counsel had "extensive experience representing consumers, and other plaintiff classes, in class-action litigation," including "experience representing consumer classes in similar data-breach cases"). There is also no evidence that Mr. Sanchez's interest conflicted with the class, as he was a "typical" class member that sought the same relief as the class and he is guaranteed nothing more than they will receive.

To reach this result, class counsel investigated the class's claims when litigating them in Court and when mediating them with Cavender's, insisting on "informal discovery in advance of mediation to ensure Class Counsel had sufficient facts and information to make an informed decision about resolution[.]" Borrelli Fee Dec. ¶ 5. Thus, counsel had a "full understanding of the legal and factual issues surrounding this case" when agreeing to mediate. *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D. Tex. 1996). And that work preceded counsel's efforts in "mediating the dispute, review[ing] 'confirmatory' discovery, draft[ing] the settlement agreement and exhibits, prepar[ing] and submit[ing] the Motion for Preliminary approval (which was ultimately granted), and implement[ing] the parties' settlement[.]" Borrelli Fee Dec. ¶ 5.

For these reasons, Mr. Sanchez has satisfied the "adequacy" factors.

  iii.  <u>This case's risks, complexity, and expense justify settlement at this stage</u>

There is "an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Assoc. for Disabled Am., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002). And this case is not only "complex"—"it lies within an especially risky field of litigation: data breach." *Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CIV-61275-RAR, 2023 U.S. Dist. LEXIS 117355, at *24 (S.D. Fla. July 8, 2023). This is why courts favor settling breach cases. *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 U.S. Dist. LEXIS 87409, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010). "When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein*, 705 F. Supp. 2d at 651 (citing *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)). Although Mr. Sanchez believes his claims are strong and that he would have overcome the hurdles of a motion to dismiss, class certification, dispositive motion briefing, and trial, given the challenges faced in any complex litigation (which are even more acute in the developing area of data breach), the risks that justified settling at the stage Mr. Sanchez did. *See Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("Settling now avoids the risks and burdens of potentially protracted litigation.")

And although the parties have settled this matter without "formal" discovery, that is no bar to settlement. *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999) (The "[s]ufficiency of information does not depend on the amount of formal discovery which has been taken because other sources of information may be available to show the settlement may be approved even when little or no formal discovery has been completed."). Again, the settlement achieves what Mr. Sanchez wanted in his complaint—compensation for the class's losses, protection against future risk, and a requirement that

11

Cavender's improve its security. There is no reason to risk losing recovery entirely by refusing to settle on those terms.

    iv.    <u>Class counsel recommends the settlement</u>

The Court should consider class's counsel opinion on settlement because "[t]he Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight" when "evaluating a proposed settlement." *Klein*, 705 F. Supp. at 649 (citing *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978)); *DeHoyos v. Allstate Corp.*, 240 F.R.D. at 292 ("The endorsement of class counsel is entitled to deference."). As class counsel explains by declaration, they understand how data breach cases work and the factors to consider when litigating them. Doc. 15-1 ¶¶ 13-14. They also understand how the relief secured here exceeds that achieved in other cases. *Id*. ("Of the various forms of relief available in national consumer protection class actions (injunctive, declaratory, coupons, gift cards, cash compensation, etc.), the relief obtained by Class Counsel in this case is of the most preferable form: remedial relief plus cash compensation."). The Court should accept this judgment when weighing the approval. *See Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 346 (N.D. Tex. 2011) ("As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'"). As a result, Mr. Sanchez satisfies this factor.

    v.    <u>The method for delivering relief supports approval</u>

If the Court approves the settlement, RG/2 will pay verified claims and facilitate enrollment in credit monitoring as requested by the class. Given that RG/2 has experience in delivering relief like this—including over $1.8 billion in cash payments to consumers, Mr. Sanchez trusts that the class will receive what they qualify for under the settlement.

12

      vi.      <u>The settlement treats class members "equitably"</u>

Mr. Sanchez satisfies the factor under Rule 23(e)(2)(D) because all class members are treated "equitably." RG/2 notified all class members using the same methods, reaching 96% of them and affording them the same options. And although their recoveries may vary in amount, that does not render the relief "inequitable," as it compensates them for their "relative" losses. *Spegele v. USAA Life Ins. Co.*, No. 5:17-cv-967-OLG, 2021 U.S. Dist. LEXIS 204744, at *30 (W.D. Tex. Aug. 26, 2021) (approving a settlement that award differing recoveries based on a formula that considered class member's "relative" losses). What's more, the relief is "adequate" because there is no cap on what Cavender's must pay under the Agreement, meaning Cavender's will pay every verified claim in full.

      vii.      <u>Class members have not objected to the settlement</u>

As RG/2 explains by declaration, no class members opted out or objected to the settlement—speaking to the positive response to it. Within those claims, most class members who claimed benefits requested credit monitoring or had their monitoring renewed under the monitoring Cavender's offered after the breach. *See* Decl. of R Borrelli in Support of Motion for Final Approval. Courts note that credit monitoring offers "significant value" to class members following a breach, as it is a "repeatedly lauded" benefit "that would likely not other be recoverable at trial." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *17 (N.D. Ga. Mar. 17, 2020); *see also In re Banner Health Data Breach Litig.*, No. 2:16-cv-02696-SRB, 2020 U.S. Dist. LEXIS 70837, at *17 (D. Ariz. Apr. 21, 2020) (collecting cases on the credit monitoring's value). As a result, the Court should find this factor supports settlement.

**B. The Court should finally certify the settlement class**

Settlement classes are routinely certified in consumer data breach cases. There is nothing unique about this case that would counsel otherwise. This Court already found when it preliminarily approved the Settlement that it likely would certify the class. The class still meets the requirements of numerosity, commonality, typicality, and adequacy, and because common issues predominate and a class action is the superior means by which to resolve class member claims, the Court should finally certify the Settlement Class for settlement purposes. Where nothing has changed relative to the Rule 23(a) and pertinent Rule 23(b) factors since preliminary approval, that decision should be made final, for the reasons set forth in the Plaintiff's Preliminary Approval Motion and Supporting Memorandum. See Doc. 13.

### C. The Notice Plan Complied with Rule 23 and Due Process

The Court should approve the notice plan because the parties directed "notice in a reasonable manner" under Rule 23. Class members are entitled to the "best notice that is practicable under the circumstances" of any proposed settlement before it is finally approved by the Court. *Id*. "The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means." *Id*. To comply with due process, notice must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Windsor*, 521 U.S. 591, 617. Notice must explain: (i) the action; (ii) how the class is defined; (iii) the class claims, issues, or defenses; (iv) that a class member appear through an attorney; (v) that the court will exclude from the class any member who requests it; (vi) the time and manner for requesting exclusion; and (vii) the binding effect that class judgment has on members. Fed. R. Civ. P. 23(c)(2)(B).

Having notified 96% of class members with the details demanded by caselaw, the notice program satisfied this prong. The parties used First Class Mail to alert class members to the

settlement, a recognized notice method. *See Stott v. Capital Financial Services*, 277 F.R.D. 316, 342, (N.D. Tex. 2011) (approving notice sent to all class members by first class mail); *Billittri v. Securities America, Inc.*, Nos. 3:09-cv-01568-F, 3:10-cv-01833-F, 2011 WL 3586217, *9 (N.D. Tex. Aug. 4, 2011) (same). The content of the Notice provided adequately informed class members of the nature of the action, the definition of the class, the claims at issue, the ability of a class member to object or exclude themselves, and/or enter an appearance through and attorney, and the binding effect of final approval and class judgment. The Notice utilized clear and concise language that is easy to understand and organized the Notice in a way that allowed class members to easily find any section that they may be looking for. Thus, it was substantively adequate.

RG/2 also set up a website for class members to review all case documents and review the settlement's details, ensuring they could claim benefits with ease. It also notified 44 attorneys general about the action under CAFA, receiving no objections from them in response. This effort exceeds what Mr. Sanchez must show to carry his burden on the due process prong. *See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 807 F. App'x 752, 764 (10th Cir.), cert. denied sub nom. *Gonzalez v. Elna Sefcovic, LLC*, 141 S. Ct. 851 (2020) ("All that the notice must do is 'fairly apprise ... prospective members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests.") (internal citations omitted).

## CONCLUSION

For the reasons above, the Court should enter an order finally approving the parties' settlement, certifying the class for purposes of judgment on the Settlement, and granting Plaintiff's request for attorneys' fees, costs, and service award.

Dated: November 13, 2023                    Respectfully Submitted,

                                                      By: *Joe Kendall*
                                                          Joe Kendall
                                                          KENDALL LAW GROUP PLLC
                                                          3811 Turtle Creek Blvd., Suite 825
                                                          Dallas, TX 75219
                                                          Telephone: (214) 744-3000
                                                          Facsimile: (214) 744-3015
                                                          jkendall@kendalllawgroup.com

                                                          Raina C. Borrelli (*pro hac vice*)
                                                          TURKE & STRAUSS LLP
                                                          613 Williamson Street, Suite 201
                                                          Madison, WI 53703
                                                          Telephone: (608) 237-1775
                                                          Facsimile: (608) 509-4423
                                                          raina@turkestrauss.com

                                                          *Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(h), I hereby certify that I conferred with counsel for Defendant Cavender Stores, Ltd. regarding the above-referenced motion for final approval of class settlement. Defendant does not oppose the relief requested therein.

*/s/ Raina C. Borrelli*
Raina C. Borrelli

## CERTIFICATE OF SERVICE

I, Joe Kendall, hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record via the ECF system.

*Joe Kendall*
Joe Kendall